# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

FILED

APR 17 2009

CLERK

No. 08-1559

United States of America,

           Appellee,

    v.

Robert John Farrell,

           Appellant.

No. 08-1561

United States of America,

           Appellee,

    v.

Angelita Magat Farrell,

           Appellant.

Appeals from the United States
District Court for the
District of South Dakota.

Submitted: November 11, 2008
Filed: April 17, 2009

Before MELLOY, BOWMAN, and SMITH, Circuit Judges.

MELLOY, Circuit Judge.

A jury convicted Robert John Farrell and Angelita Magat Farrell of four counts of peonage in violation of 18 U.S.C. § 1581, one count of conspiracy to commit peonage in violation of 18 U.S.C. § 371, two counts of making false statements in violation of 18 U.S.C. § 1001, one count of visa fraud in violation of 18 U.S.C. § 1546, and one count of document servitude in violation of 18 U.S.C. § 1592. The Farrells appeal, arguing that the evidence was insufficient to support the jury's verdict as to the charges of peonage, conspiracy to commit peonage, and document servitude. The Farrells further argue that the district court[1] erred in admitting certain expert testimony. Having jurisdiction under 28 U.S.C. § 1291, we affirm the convictions.

I.

The Farrells own and operate the Comfort Inn & Suites in Oacoma, South Dakota. In both 2005 and 2006, the Farrells contracted to bring nine non-immigrant workers from the Philippines to the United States under temporary visas for the stated purpose of working as housekeepers in their hotel. The Government charged the Farrells with committing crimes against four of the nine. The Farrells assert that the Government presented insufficient evidence at trial to allow a reasonable jury to convict them of peonage, conspiracy to commit peonage, and document servitude.

"This court reviews the sufficiency of the evidence supporting a conviction de novo, viewing evidence in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict." United States v. Phythian, 529 F.3d 807, 811 (8th Cir. 2008)

---

[1]The Honorable Charles B. Kornmann, United States District Judge for the District of South Dakota.

(quotation omitted). This court will "reverse only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." Id. (quotation omitted). Thus, we recount the facts in the light most favorable to the verdict.

A. First Application for Non-Immigrant Workers—2005

While visiting family in the Phillippines in 2005, the Farrells began actively recruiting Filipino workers to come and work for them in the United States. After soliciting several individuals, the Farrells submitted an I-129 Petition for a Nonimmigrant Worker ("Petition") to the Department of Homeland Security on August 17, 2005. The Petition stated that they were seeking housekeepers from October 1, 2005, until January 31, 2006, at a salary of $300 per week. The Farrells were required to pay the government a one-time processing fee of $1200 with the submission of the Petition.

In addition to the Petition, the Farrells drafted employment contracts for each of the nine workers they had solicited. As with the Petition, these contracts stated that the Farrells would employ the workers as housekeepers and that the workers would work six days per week for eight hours each day. The contracts set compensation at $6.05 per hour and also provided for holiday and overtime pay. In addition to these provisions, the contracts stated that the Farrells were responsible for housing the workers and that each worker would reimburse the Farrells $150 per month for this expense. The contracts also provided that the Farrells were responsible for the cost of transportation to and from the United States, as required by law. After the Farrells submitted the Petition and drafted the employment contracts, the workers filed their applications for non-immigrant visas with the U.S. Embassy in Manila, Phillippines. The applications reflected the terms of the employment contracts as recounted above, including the promise that the Farrells would pay for the workers' transportation to and from the United States.

Prior to the consular officers' adjudication of the workers' visa applications, the workers met with the Farrells in a Manila hotel. During this meeting, the Farrells prepped the workers for the visa interviews at the Embassy. The Farrells also revealed additional details about the job, including the fact that despite the provisions in the employment contracts and the requirements of U.S. law, the Farrells would not reimburse the workers for transportation to and from the United States. The Farrells stressed, however, that the workers' visas would be denied if the workers told this information to the consular officers and that they should refrain from mentioning it. The Farrells further stated that despite the contractual provisions, the workers would not receive holiday or overtime pay. Finally, the Farrells informed the workers that the $1200 Petition-processing fee would be divided equally among them.

Thus, upon leaving for the United States, the workers were under the impression that they would be making $6.05 per hour and working eight-hour days for six days each week. They also knew that they would be responsible for reimbursing the Farrells for the cost of transportation to and from the country, as well as one-ninth of the processing fee. Despite beginning the employment relationship financially indebted to the Farrells, the workers anticipated being able to pay back the money soon after their employment began. Many looked forward to working in the United States because the Philippines is a "poor country" with a "high unemployment rate" and "great corruption," and they anticipated that even with the debt payments, they would be able to send money home to their families. The U.S. Embassy approved the visas.

When the workers arrived in South Dakota in November 2005, the employment situation was not as they had anticipated. Angelita immediately required the workers to surrender their passports, visas, and immigration documents. Many of the workers were reluctant to do so but obeyed out of the "honor and respect" Filipino culture demanded they show their employers. Upon starting their jobs, the Farrells informed the workers that instead of an hourly wage they would be paid $3 per room. Because

it took around one hour to clean a room to the Farrells' standards, the workers were making approximately one-half the wage the Farrells had promised (and had included in the paperwork), which was well under minimum wage. If the rooms were not up to the Farrells' standards, Robert told the workers they would not be paid at all. The Farrells further informed the workers that each of the nine would be individually responsible for the entire amount of the $1200 processing fee, despite the fact that the Farrells only paid the fee once.

In addition to the processing fee, the Farrells began charging the workers for transportation to and from work (which had not been agreed to in the employment contract) and began charging them for personal items that the workers neither requested nor desired. Thus, once in the United States, the workers' debt increased dramatically while the income with which they anticipated being able to pay down that debt had decreased by at least one-half. Recognizing that the workers would not be able to pay their increasing debt from their hotel paychecks, the Farrells required that the workers obtain outside employment. The Farrells facilitated the workers' interviews at local fast-food restaurants and other service-industry establishments. Many of the locations where the workers interviewed eventually employed the workers, in direct violation of their visas.

Other than when at their non-hotel employment, the workers spent little time away from the hotel. This was, in part, because of the manner in which the Farrells controlled the workers' free time. The workers were not permitted to leave their shared apartment, even to visit the drug store, without asking permission from either the Farrells or the hotel manager, Alma Navarro. Frequently, the Farrells told the workers that they were not to speak with anyone outside of the hotel and that they were prohibited from socializing with Americans. The prohibition against speaking to other people went so far as to preclude the workers from speaking to the non-Filipino workers who were employed at the same hotel.

When American co-workers at one of the fast-food restaurants invited several of the workers to go bowling, Robert insisted on driving the workers to the alley and remained there to supervise them. This was despite the fact that a co-worker had volunteered to drive the workers home when they were finished. At one point, without asking permission, several of the workers accepted an invitation from the fast-food-restaurant shift manager to visit a local bar. The workers did not miss their scheduled shifts at the hotel, and there was no evidence that the activity otherwise interfered with the workers' employment there. When the workers returned from the outing, however, the Farrells summoned them into the hotel office and proceeded to reprimand them for disobeying the rules against socialization. The workers testified that they were afraid of Robert. The Farrells even told the workers that they were not to accept rides from their co-workers, meaning that many were required to walk home from work in the freezing cold and snow.

In addition to the explicit prohibitions the Farrells placed on the workers, the workers' use of their free time was also constricted by the fact that they had very little of it. Far from the eight-hour days the workers had anticipated, they regularly worked upwards of thirteen hours per day, seven days a week, frequently traveling directly from the hotel to their outside employment or vice versa. The workers' living situation was also not as anticipated. The Farrells did provide housing, but seven workers were required to share one two-bedroom apartment. The Farrells paid only $375 per month for the lease but still charged the workers $150 per person per month. The workers were not given a key to the apartment; rather, Angelita and Navarro retained possession of the key. The workers were thus forced to leave the door to the apartment unlocked at all times. Frequently, Angelita would arrive at the residence unannounced, enter the premises, and search through the workers' belongings. In another invasion of the workers' privacy, Navarro would watch while the workers opened their personal mail, all of which was sent to the hotel. The Farrells had told the workers that the apartment was not registered with the post office and that their mail would be lost if sent directly there.

Despite the volume of work, the workers' income was still insufficient to meet their mounting debt obligations. Motivated by the workers' inability to pay their debts, the Farrells instituted a debt-prioritization scheme. As part of this plan, the Farrells required each of the workers to provide a breakdown of all of the paychecks that they had received while in the country, including those from their outside employment. In this accounting, the workers were also required to indicate how much they had sent back to the Philippines and the purpose for which the money had been sent. The Farrells also required a breakdown of each of the worker's expenses in South Dakota, including food, personal items, and telephone calls. The Farrells told the workers that this accounting would allow the Farrells to determine how much money they would allow each worker to spend and send home. One worker testified that these requirements meant that she gave the Farrells over ninety percent of her weekly income. When another worker pleaded to be allowed to keep more money so she could pay for her sister's tuition in the Philippines, the Farrells refused.

To ensure that the workers adhered to their debt-prioritization scheme, the Farrells forced the workers to sign contracts guaranteeing repayment and kept detailed records of each worker's debt. The Farrells would regularly hold meetings with the workers during which they consulted their debt logs and severely berated the workers for missteps at the hotel or spending money without permission. Robert always emphasized the importance of debt repayment at these meetings, and to punctuate his point, he frequently threatened to ship the workers back to the Philippines in a "balikbayan box"[2] if they attempted to run away or do anything behind the Farrells' backs. The Farrells also stressed that the workers were in the United States by their grace and that if the workers avoided their payment obligation the Farrells would call immigration authorities. Following each group meeting, the Farrells held individual meetings with the workers to discuss each person's debt in detail. The workers

---

[2]A balikbayan box is a small cardboard or wooden box that Filipinos living abroad use to send gifts back to the Philippines. Given its purpose and size, it is clearly not an appropriate method of travel for a living human being.

testified that they were frequently scolded for spending too much money. Ultimately, prior to the workers' first departure from the United States, the Farrells required those employed at the fast-food restaurant to endorse their last paychecks to the Farrells.

Despite paying the Farrells the majority of their earnings, as the workers' visas were set to expire, they were all in much greater debt than they had been upon arriving in the country. Each worker initially had been promised two trips to work at the hotel, but the Farrells made them write letters establishing why they deserved to return. Begrudgingly, the workers wrote letters requesting re-employment. The workers testified that they had no interest in working for the Farrells but that it would have been impossible to repay the debt by working in the Philippines. Because the Farrells had made each worker sign a debt contract and had threatened the workers with physical harm if they defaulted, the workers testified that they believed they had no other option but to return to the United States again and fulfill their contractual duties or face imprisonment or worse in the Philippines. The workers testified that they would never have come to the United States in the first place had they known the extent of debt for which they would be responsible.

B. Second Application for Non-Immigrant Workers—2006

The Farrells submitted their second I-129 Petition in early 2006. This time, the Petition listed the workers' salaries as $242 per week. Again, prior to the workers' consular interviews, the Farrells met with the group. They explicitly told the workers not to list their prior outside employment on the visa applications because the applications would be denied. The Farrells also told the workers to tell the government that the Farrells would pay for transportation to and from the United States. The Farrells then proceeded, however, to require each worker to acknowledge an additional $1200 debt for the transportation cost. At that meeting, the Farrells also provided the workers with copies of fake checks as evidence that the Farrells had paid the workers in accordance with the previous contract. The workers testified that they had neither received nor previously seen these checks.

-8-

Upon the workers' second arrival in the United States, the Farrells again required the workers to turn over their passports and immigration documents. As before, the workers did so in deference to their employers. The workers faced the same cramped living situation, and some of them were without a bed on which to sleep. Again, the Farrells prohibited the workers from socializing and required that they even ask permission before making phone calls.

The Farrells required the workers to sign a second debt contract, and in addition to recording the workers' income and mounting debt, the Farrells instituted a rigid schedule of mandatory bi-weekly payments. To cover these payments, the Farrells required that each worker surrender his or her hotel paycheck to them and post-date additional checks in the amount of the bi-weekly payment obligation. The payment amounts depended on the individual's indebtedness, but they ranged from $361 to $431 every two weeks. With a salary of only $242 per week, of which the workers were required to pay $150 toward housing per month, plus additional amounts for non-requested expenditures and personal items, the bi-weekly payments constituted an amount greater than the workers' salaries.

As the workers' debts mounted and their ability to pay diminished, the Farrells' debt-focused meetings became increasingly hostile. The Farrells would spontaneously call the meetings late at night and require those who were not working at the hotel to come from home to attend, even if that meant rousing them from sleep. The workers were not compensated for their attendance at the meetings. As before, the Farrells would berate the workers for anything they had done wrong at the hotel and emphasize the necessity of repayment. Robert frequently warned the workers not to go "TNT" or "tago ng tago," a Tagalog saying commonly used to refer to undocumented immigrants in hiding. He told the workers that if they went TNT he would find them and ship them back to the Philippines in a balikbayan box. Severely frightened, the workers believed the Farrells would find them no matter where they were. Robert repeated this threat several times per month both outside of and during meetings. At least once, the threat appears in the minutes of a meeting.

The Farrells' tirades against the workers would often last into the early hours of the morning. On at least one occasion, after one worker refused to provide post-dated checks in the amount of the bi-weekly payment, the Farrells kept her in the meeting room until six in the morning. During that time, Robert continually yelled at her despite the fact that the worker was extremely frightened and crying. Because she was scheduled to work the next morning's shift at the hotel, once the Farrells released her she began her shift without having slept. Two other workers testified that when they sent money back to their families without asking permission, they were called into the office and reprimanded, being told that the Farrells were the only ones who would decide how the workers spent their money. One of the workers testified that Robert was so angry during this meeting that he feared Robert would punch him. The worker further testified that he was unable to do anything to stop the abuse because he was paralyzed by fear and did not "know anything about [how it works] here in America." He was convinced that Robert had the power to do to the workers whatever he wanted to do.

During this entire time, only one worker was able to leave the United States. After lying about how her mother was in the hospital and dying, the Farrells allowed her to return to Manila, but they controlled her every movement up until her departure. Angelita escorted the worker to the airport and only returned her passport when it was required to pass through security and board the plane. The woman never returned to the United States to work for the Farrells, but she testified that they harassed her via e-mail and telephone to ensure that she paid her debt. Eventually, as a result of the harassing conduct, the worker contacted the U.S. Embassy in Manila and an investigation was started.

In June 2006, two other workers attempted to leave after the Farrells accused them of stealing tips from the hotel rooms and humiliated them in front of the other workers as punishment. Their desire to return to the Philippines caused immediate conflict. Following a verbal altercation at the hotel, the Farrells accompanied the

workers to their apartment, rushing them to get their belongings together so that the Farrells could take them to the airport. The Farrells informed the workers that immigration authorities were waiting to deport them, and when the workers attempted to call someone and ask for help, Angelita confiscated the telephone. Eventually, Robert called the chief of police and the FBI seeking to have the workers arrested. The chief of police arrived and talked to the workers, informing them that they could stay until their scheduled return flight, which was less than one week later. The police chief acknowledged that the workers were "terrified" of the Farrells and refused to speak in front of them. When the police chief left, the Farrells stayed outside of the apartment to prevent the workers from leaving. When the workers expressed concern about being able to purchase food, the Farrells said they would have to make do with what was in the refrigerator.

Still without their passports and thus unable to leave on their own, but fearful of what would happen, the workers found an old phone from the hotel, plugged it in, and called the manager of the fast-food restaurant (where some of the workers were employed) to ask for help. The workers also called the county attorney. Sometime thereafter, the chief of police returned to the apartment because, upon reflection, he felt as though the Farrells had used him to intimidate the workers. Sensing something was wrong, both he and the county attorney arranged for the workers to be removed from the apartment and the Farrells' control. The county attorney testified that it was "very apparent" that the workers were living in fear of the Farrells.

II.

A. Peonage

Peonage is "compulsory service in payment of a debt." Bailey v. Alabama, 219 U.S. 219, 242 (1911). "[C]ompulsory service" is the equivalent of "involuntary servitude," id. at 243, which the Supreme Court has defined as "a condition of servitude in which the victim is forced to work for the defendant by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process." United States v. Kozminski, 487 U.S. 931, 952 (1988).[3] Thus, in order to prove peonage, the government must show that the defendant intentionally held a person against his or her will and coerced that person to work in order to satisfy a debt by (1) physical restraint or force, (2) legal coercion, or (3) threats of legal coercion or physical force. See id. at 952–53. In determining whether "physical or legal coercion or threats thereof could plausibly have compelled the victim to serve," the jury is entitled to consider "evidence of other means of coercion, or of poor working conditions, or of the victim's special vulnerabilities." Id.

In this case, a reasonable jury could have found that the Government proved the elements of peonage beyond a reasonable doubt. As discussed above, the workers testified extensively about their treatment while in the Farrells' employment. They testified that Robert threatened them with physical force; namely, that if they attempted to "run away" he would find them, "put them in a balikbayan box," and ship them back to the Philippines. Despite the Farrells' argument to the contrary, it is indisputable that this statement was a threat of physical force. The evidence thus

---

[3] Jury Instruction 16 defined "involuntary servitude" as follows: "[A] condition of compulsory service in which the alleged victim is compelled to perform labor or services against the alleged victim's will for the benefit of another person due to the use or threat of physical restraint or physical injury, or by the use or threat of arrest, prosecution, or imprisonment. . . . The use or threat of a civil lawsuit does not make the labor involuntary."

supports a finding that the workers were reasonable in inferring from these statements that the Farrells were willing to harm them if they attempted to stop working and leave.

The workers also testified about the Farrells' threats to have immigration authorities arrest and deport the workers if they did not "comply" with the Farrells' directives. The Farrells also threatened to call immigration authorities (and did ultimately call the FBI and the chief of police) after two workers expressed a desire to leave. These threats of arrest and deportation came despite the fact that the workers gave no indication that they would resist returning to the Philippines. The Farrells argue that they were legally entitled to explain to the workers that their visas were contingent on continued employment at the hotel. It is another thing entirely, however, to threaten to have immigration authorities arrest the workers as a consequence of failing to abide by the Farrells' rules—rules that included a prohibition on speaking with people outside of the hotel, presumably for fear that the workers would reveal the conditions of their employment—or as a tactic to keep the workers until the end of their contracts by exploiting their fears of being imprisoned by immigration authorities if they left early. See United States v. Veerapol, 312 F.3d 1128, 1131, 1132 (9th Cir. 2002) (finding sufficient evidence to sustain a conviction for involuntary servitude, based, in part, on the employer's statement that "the police in the United States would arrest [the victim] as an illegal alien were [the victim] to seek their help").

In addition to showing the Farrells threatened the workers with physical force, arrest, and imprisonment, the evidence further supports the jury's finding that these threats actually compelled the workers to serve in order to satisfy their debt when viewed in conjunction with the workers' working and living conditions, as well as their particular vulnerabilities. See Kozminski, 487 U.S. at 952. The evidence is clear that the workers subjectively feared the Farrells. They believed Robert when he threatened to hunt them down and ship them back to the Philippines in a balikbayan

box, and they feared for their lives and the lives of their children if they were not able to meet their debt obligations or left the Farrells' employment. Their fear of Robert was not unfounded as the evidence shows he regularly lost his temper during meetings at the hotel, revealing to the workers his volatile temper and sparking fears that he would resort to physical violence. There was also sufficient evidence to show that the workers reasonably believed that their employers were "powerful people" and could indeed "hunt them down" if the workers left. For example, after the Farrells had some initial trouble obtaining visas in Manila, Robert showed the workers a letter from congresspersons in South Dakota and told them that the letter would fix the problem. The visas were subsequently approved, leading the workers to believe that the Farrells were well connected politically.

The workers' employment and living conditions also provide support for the jury's conclusion that the Farrells' threats "plausibly . . . compelled the victim[s] to serve." Id. at 952. In short, the conditions were difficult. The workers labored lengthy back-to-back shifts at the hotel and their outside jobs—employment facilitated and required by the Farrells—to meet their mandatory bi-weekly debt payments. One worker testified that this rigorous schedule precluded sleep at least four times per week. See Veerapol, 312 F.3d at 1130–31 (discussing circumstances such as "excessive working hours" that supported a jury finding of involuntary servitude). The Farrells also denied the workers time off when the workers so requested. See United States v. Sabhnani, 539 F. Supp. 2d 617, 620 (E.D.N.Y. 2008) (recounting numerous "abuses" that served as a basis for a conviction, including twenty-hour work days and no regular days off). In addition to the long hours, the workers were not paid in accordance with their contract and were at times paid below minimum wage.

The Farrells continually isolated the workers from others in the community by refusing to allow them to speak or socialize with non-Filipino co-workers, by channeling all mail through the hotel where it had to be opened in the presence of the hotel manager, by refusing to allow them to leave the apartment to perform even the

-14-

most mundane tasks without asking for permission, and by refusing to allow the workers to travel or otherwise spend their free time outside the hotel or apartment. See, e.g., Veerapol, 312 F.3d at 1130–31 ("Veerapol isolated her workers . . . by prohibiting them from . . . going to stores, speaking with her houseguests and the customers at the restaurant . . . or using the telephone or mail."); United States v. Djoumessi, 538 F.3d 547, 549 (6th Cir. 2008), cert. denied, 129 S. Ct. 948 (2009); Sabhnani, 539 F. Supp. 2d at 620. In addition to this social isolation, the Farrells attempted to control every other aspect of the workers' lives. They dictated the amount of money the workers were able to send back to the Philippines and for what purpose; required the workers to post-date checks that the workers knew they would not be able to cover unless they continued working at the hotel; and kept a key to the workers' residence so that they could conduct random inspections of the premises while refusing to allow the workers a key of their own.

Furthermore, the coercive nature of the threats is amplified by the workers' "special vulnerabilities," Kozminski, 487 U.S. at 952, which include the fact that the workers were in the United States under temporary-work visas sponsored by the Farrells.[4] Many of the workers arrived in the United States with very little money and were entirely dependent upon the Farrells for their housing and transportation. The fact that the Farrells required the workers to have outside jobs also added to their vulnerability. Even if the workers believed that they could leave the Farrells' employment and seek help, the Farrells made them acutely aware that they could have them deported for holding jobs outside of the scope of their visas. This fear was not

---

[4] While debt is an element of the peonage charge, we also cannot ignore the creditor–debtor relationship as a source of vulnerability. Far from simply owing the Farrells money, the workers relationship with their employers was more akin to one of debt bondage rather than simple debt. Given the continually mounting expenses, at no point was the value of the workers' labor sufficient to liquidate the debt and there was, in effect, no limit to the length of the services required to satisfy the obligation or even a limit on the amount owed.

unfounded. At some point during July 2006, even after she was under investigation, Angelita sent a letter to Immigration and Customs Enforcement officials at the Minneapolis airport to inform the agency that several of the workers (who law-enforcement officials had already removed from the Farrells' control) had taken unauthorized employment at various locations while they were working for the Farrells.

The Farrells argue that the possibility of deportation alone was insufficient to provide the requisite compulsion for peonage because being deported to the Philippines was not the equivalent of "imprisonment or worse," and they cite a First Circuit case for that proposition. See United States v. Alzanki, 54 F.3d 994, 1004 (1st Cir. 1995) ("[T]he evidence must establish that the victim reasonably believed she was left with no alternative to continued servitude that was not the equivalent of imprisonment or worse." (citation omitted)). In other words, the Farrells contend that the workers could have simply stopped working and been deported.

Even assuming, as the Farrells' argument requires, that the only thing that kept the workers laboring was a fear of being deported, we are not persuaded. Here, the threat of deportation was more than a threat of removal from the United States or a threat to legitimately use the legal process to ensure that the workers abided by the terms of their visas. The Farrells had made it clear during various meetings that they would seek to collect the money the workers owed no matter where the workers went. It would have been extremely difficult, if not impossible, for the workers to meet their debt obligations on salaries in the Philippines. Based on Robert's threats that he would hunt the workers down and harm them if they failed to pay their debts, it was not unreasonable for the workers to believe that failure to pay their debt, even when back in the Philippines, would result in physical harm. As a consequence, here the threat of deportation was, in essence, a threat of force. See Kozminski, 487 U.S. at 948 ("[I]t is possible that threatening . . . an immigrant with deportation could constitute the threat of legal coercion that induces voluntary servitude . . . ."); see also

Djoumessi, 538 F.3d at 552; Alzanki, 54 F.3d at 1004–05 (finding that the victim's awareness of the "severely restrictive conditions" that she would encounter in the country to which she would be deported enabled the jury to conclude that "threatened with deportation . . . [the victim] confronted an alternative to continued involuntary service which she reasonably considered at least as severe as imprisonment").

The Farrells repeatedly claim that the workers' employment was voluntary and because voluntariness is a defense to the peonage charge, it is impossible for the workers' employment to have constituted involuntary servitude. As evidence of the voluntary nature of the employment, they cite the workers' return to the United States in the spring of 2006 for a second contractual term and to the fact that they allowed one worker to return to the Philippines to care for her ailing mother. Despite their argument, however, based on the evidence recounted above, a reasonable trier of fact could have concluded that the workers were not, in fact, free to leave and that it was the Farrells' coercive acts that compelled the workers to stay in the United States and return on a second work visa in order to satisfy their debts.

The fact that the workers left the country and then returned does not automatically make their employment voluntary. As discussed above, the workers would not have been able to pay their debt by working in the Philippines, and they believed that the Farrells would physically harm them if they failed to pay. Thus, a reasonable jury could conclude that the workers believed they had no choice but to return to United States and did not do so voluntarily. See United States v. Bibbs, 564 F.2d 1165, 1168 (5th Cir. 1977) ("[A] defendant is guilty of holding a person to involuntary servitude if the defendant has placed him in such fear of physical harm that the victim is afraid to leave, regardless of the victim's opportunities for escape."). Even assuming that there were points at which the workers could have escaped the Farrells' control, a rational jury could have concluded that the workers' employment "was involuntary for at least *some* portion of [their] stay. And that involuntary portion would suffice to sustain the conviction." Djoumessi, 538 F.3d at 552–53 (emphasis

in original) (citing 18 U.S.C. § 1584, which requires the involuntary servitude be for "any term"). Furthermore, once in the United States, it is undisputed that the workers needed their passports and immigration documentation to leave the country. It is also undisputed that these documents remained in the possession of the Farrells during the workers' entire stay. Realistically, without these documents, the workers were required to remain in the command, if not the employment, of the Farrells.

Given the above, a reasonable jury could have found that the Government presented sufficient evidence to prove beyond a reasonable doubt that the Farrells' threats of physical force and arrest compelled the workers to serve in order satisfy their debts. The evidence establishes that the workers reasonably believed that they had no option but to continue working for the Farrells. Accordingly, the conviction for peonage is affirmed.

B. Conspiracy to Commit Peonage

The jury concluded that the Farrells engaged in conspiracy to commit peonage in violation of 18 U.S.C. § 371. The Farrells again contest the sufficiency of the evidence stating that they did not hold the workers in a condition of peonage and had no agreement to do so. To prove conspiracy under § 371, the Government must show beyond a reasonable doubt that the Farrells knowingly "entered into an agreement or reached an understanding to commit a crime," and that at least one of the Farrells "overtly acted in furtherance of the agreement." United States v. Bertling, 510 F.3d 804, 808 (8th Cir. 2007) (quotations omitted). "An agreement forming a conspiracy may be either explicit or implicit." United States v. Boesen, 541 F.3d 838, 853 (8th Cir. 2008).

The jury's conviction of the Farrells of conspiracy to commit peonage was sufficiently supported by the Government's evidence. The jury could infer from the Farrells' joint and extensive involvement in the visa application procedure, in the running of the hotel, and in the administration of the housing that the Farrells

knowingly entered into an agreement to hold the workers in a condition of peonage. See United States v. Tipton, 518 F.3d 591, 595–96 (discussing the evidence of joint involvement of the co-conspirators). Additionally, any of the acts described in detail above are sufficient to satisfy the overt-action element once the jury determined that there was an agreement. See id. We thus affirm the conviction for conspiracy to commit peonage.

### C. Document Servitude

The Farrells also contest the sufficiency of the evidence with regard to their conviction for document servitude. In order to prove that the Farrells committed document servitude, the Government must show that the Farrells (1) concealed, removed, confiscated, or possessed the workers' passports, visas, or other immigration documents; (2) did these acts in the course of violating the peonage statute with the intent to violate the statute; and (3) acted knowingly and intentionally. 18 U.S.C. § 1592(a).

The evidence at trial was sufficient for a reasonable jury to convict the Farrells of document servitude. The Farrells do not contest that Angelita confiscated the workers' passports, visas, and entry cards upon their arrival in the United States in both 2005 and 2006. The Farrells also do not contest that they knowingly retained possession of these documents throughout the workers' entire stay. Numerous workers testified that they did not possess their passports while working at the hotel and that the Farrells took the documents to "control" them. Angelita only returned one worker's passport when that worker was at the airport and ready to board the plane. The chief of police further indicated that even after he specifically requested that Robert turn the workers' immigration documents over to the workers, Robert still refused. It was only after the chief of police threatened to arrest him for theft that Robert complied.

In addition to having confiscated and knowingly possessed the passports, as outlined extensively above, there was sufficient evidence that the Farrells had the intent to commit peonage and retained the documents while committing peonage. Because the evidence was such that a reasonable jury could have concluded that the Farrells committed document servitude, we affirm the conviction.

## III.

The Farrells also challenge the district court's admission of expert testimony by government witness Joy Zarembka. They allege that her testimony invaded the province of the jury to weigh the evidence, make credibility determinations, and fact-find. When a defendant "fails to object to the admission of evidence at trial, we review for plain error." United States v. Eagle, 515 F.3d 794, 801 (8th Cir. 2008). The defendant has the burden to prove that there was an error, that it was plain, and that the error affected substantial rights. Id. "If all three conditions are met, we may then exercise our discretion to notice a forfeited error, but only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id.

While expert testimony may be used to "assist the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702, an expert witness may not usurp the jury's function to weigh evidence and make credibility determinations. United States v. Azure, 801 F.2d 336, 339–40 (8th Cir. 1986). The Government called Zarembka, an expert in human trafficking and domestic-worker exploitation, as its first witness. Zarembka testified about various warning signs in employer–employee relationships that often indicate the employee is not laboring voluntarily but rather in a "climate of fear" or psychological coercion. She further testified that she believed several of these warning signs were present in the Farrells' relationships with the workers and that the workers did, in fact, labor in a "climate of fear."

-20-

Zarembka's testimony was relevant insofar as it provided this broader context for the jury to understand the workers' actions, to understand the conditions in which they may have labored, and to assess the truthfulness of their allegations. Cf. United States v. Kirkie, 261 F.3d 761, 766 (8th Cir. 2001) (allowing testimony "regarding characteristics of sexually abused children in general and as they compared with the characteristics exhibited by the victim in this case"). The expert testimony went further than this, however, and it usurped the jury's function when Zarembka opined on the strength of the Government's case and the credibility of its witnesses through references to the "incredible" and "strong" nature of the evidence against the Farrells. The testimony also invaded the fact-finding function of the jury when Zarembka testified that the workers "were not controlling their money" and that they were "forced to pay [the debt]." One of the issues before the jury with regard to the peonage charge was whether or not the workers stayed voluntarily. Given this required finding, the expert's testimony was not simply a factual conclusion but rather an attempt to express an opinion as to the guilt of the Farrells and a manner of stating that the forthcoming worker witnesses were telling the truth. See United States v. Whitted, 11 F.3d 783, 787 (8th Cir. 1993) (finding that a doctor's "diagnosis of sexual abuse was only a thinly veiled way of stating that [the witness] was telling the truth").

Thus, we agree with the Farrells that portions of the expert testimony invaded the province of the jury. We do not believe, however, that the error affected their substantial rights. Other than the expert-witness testimony, there was ample evidence upon which a jury could have found that the Farrells committed the substantive offenses charged. Furthermore, to the extent that the jury relied on the "climate of fear" theory, testimony from the victims, the police chief, the county prosecutor, and other witnesses readily established the existence of the factors that Zarembka discussed. See United States v. Montanye, 996 F.2d 190, 193 (8th Cir. 1993) (en banc) (requiring that the error prejudicially affect the district court proceedings). As

a result, the district court's error in not excluding portions of the expert testimony is an insufficient basis upon which to overturn the jury's verdict.

## IV.

For the foregoing reasons, we affirm the convictions.

---